# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1517 | **DATE** | 7/31/2003 |
| **CASE TITLE** | Kellie R. Watson vs. Home Depot USA, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Home Depot's Motion for Summary Judgment is granted as to Counts I and II. Watson's action is dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | AUG 01 2003 | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 145 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | CLERK U.S. DISTRICT COURT | date mailed notice | |
| WAP | courtroom deputy's initials | 03 JUL 31 PM 4:45 | | |
| | | FILED FOR DOCKET central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUL 3 1 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

KELLIE R. WATSON,

               Plaintiff,

     v.

HOME DEPOT USA, INC.,

               Defendant.

Case No. 01 C 1517

Hon. Harry D. Leinenweber



## MEMORANDUM OPINION AND ORDER

Plaintiff Kellie R. Watson ("Watson") filed a six-count Second Amended Complaint against Home Depot U.S.A., Inc. ("Home Depot") and its former employee, Victor W. Terrell ("Terrell"). In her complaint, Watson asserted claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (Counts I and II), and a claim of negligent hiring and retention (Count III) against Home Depot. She also asserted state law claims of assault (Count IV), battery/rape (Count V), and intentional infliction of emotional distress (Count VI) against Terrell. On February 4, 2002, the Court dismissed Count III for lack of subject matter jurisdiction and on October 25, 2002, the Court dismissed Counts IV through VI because Watson had failed to serve Terrell with a copy of the complaint. Home Depot now moves for summary judgment on Counts I and II, Watson's only remaining claims. For the following reasons, the Court grants the motion and dismisses this action in its entirety.

## I. BACKGROUND

### A. Local Rule 56.1 Responses

Local Rule 56.1 of the United States District Court for the Northern District of Illinois ("Local Rule 56.1") establishes procedures that both the moving and opposing parties must follow in filing and responding to a motion for summary judgment. Under Local Rule 56.1, the moving party must submit a statement of material facts with "references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(a)(3). In turn, the opposing party must file "a response to each numbered paragraph in the moving party's statement," and, in the case of disagreement, provide specific references to supporting evidentiary material. Local Rule 56.1(b)(3)(A). If the opposing party wishes to present additional facts that require the denial of summary judgment, it must do so in a concise statement that is also supported by citations to the record. Local Rule 56.1(b)(3)(B).

Although Watson, who now proceeds *pro se*, is entitled to a more lenient standard in some instances, she is not released from compliance with procedural rules. *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994). Indeed, Home Depot provided Watson with the required "Notice to Pro Se Litigants Opposing Summary Judgment," which explains the purpose of summary judgment, Watson's obligations to respond to Home Depot's motion, and the consequences of not doing so. *See* Local Rule 56.2. Despite receiving this

notice, Watson's submissions do not conform to two critical requirements set forth in Local Rule 56.1(b). First, she fails to file any response to Home Depot's Rule 56.1 Statement of Material Facts (the "56.1 Statement") as required by Local Rule 56.1(b)(3). If the opposing party does not controvert the moving party's statement of material facts, those facts are deemed to be admitted for the purposes of the motion. Local Rule 56.1(b)(3)(B); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). As a result, all of Home Depot's Rule 56.1 facts that are supported by the record must be deemed admitted.

Second, none of the facts set forth by Watson in a document titled List of Facts refer appropriately to admissible supporting evidence. Indeed, only paragraphs 1, 6, and 10 even cite to a supporting document. Paragraph 1 cites to a "forensic Report," but the only document that fits this description gives no support to the contentions in paragraph 1. Paragraph 6 merely refers the Court to "see attached," which is of little guidance given the numerous documents that Watson has attached to her List of Facts. Nevertheless, a review of the attached documents does not reveal any support for Paragraph 6. Paragraph 10 directs the Court to the attached "Employee Statements," which Home Depot correctly argues are inadmissible. These statements are interviewer's notes of conversations with third parties and are, therefore, double hearsay. *Dority v. City of Chicago*, No. 98 C 4893, 2001 WL 1155286, at *2 (N.D. Ill. Sept. 28, 2001). The documents themselves could perhaps be admissible and self-authenticating

- 3 -

under the business records exception to the hearsay rule, *see* FED. R. EVID. 803(6), but there is no evidence that these exhibits meet the requirements of Rule 803(6). Moreover, the third parties' statements contained in the documents are hearsay and cannot be considered for their truth. Any facts set forth in a 56.1 Statement that are "not properly supported by the record evidence must be disregarded." *Naughton v. Sears, Roebuck & Co.*, No. 02 C 4761, 2003 WL 360085, at *1 (N.D. Ill. Feb. 18, 2003).

As a result of Watson's failure to respond to Home Depot's statement of facts and her failure to set forth additional facts in compliance with Local Rule 56.1, the Court draws the background facts of this case from Home Depot's 56.1 Statement. The Court will not, however, consider any evidence adduced by Home Depot that is inadmissible pursuant to Federal Rule of Evidence 412.

## B. Facts

### 1. Watson's Employment and Orientation

In August 1999, Home Depot hired Watson as a sales associate for its North Avenue store in Chicago, Illinois. Shortly after being hired, Watson participated in Home Depot's orientation program, which lasted for about two weeks. Like all Home Depot employees, Watson received copies of Home Depot's Respect, Harassment/Discrimination, Equal Employment Opportunity, and Open Door Policies as well as training on those polices. The Harassment/Discrimination Policy prohibits harassment or discrimination and states that "[a]nyone who condones or fails to take appropriate action to address a violation of Home Depot's

harassment/discrimination policy will be subject to disciplinary action up to and including termination." It further "prohibits retaliation against any associate who comes forward to report harassment and/or discrimination." The policy emphasizes the importance of reporting any harassing or disrespectful behavior and sets forth resources that an employee may use if they feel that the policy has been violated. These resources include contacting a member of management, the Store Manager, District Manager, Human Resource Manager, or Division Vice President of Human Resources, or using the Alert Line, a phone line that enables employees to report harassment anonymously. Watson also participated in a Respect for All People training program, which further addressed workplace harassment and discrimination issues and which again informed employees about procedures available at Home Depot for resolving harassment or discrimination concerns.

A few months after hiring Watson, Home Depot transferred her to the Pro Sales Department, where her responsibilities included building relationships with and selling products to industrial, commercial, and other business customers. She appears to have performed her job satisfactorily and received a raise on July 3, 2000.

### 2. The Performance Notice

In the afternoon of July 13, 2000, however, Watson received an Associate Performance Notice (the "Performance Notice") for allegedly violating company policies or procedures. According to the Performance Notice, Watson's supervisors in the Pro Sales

Department, Terrell, who served as Assistant Store Manager, and Ford Neubert ("Neubert"), the Department Supervisor, found Watson in a friend's car in the Home Depot parking lot while she was supposed to be at her desk. Terrell and Neubert prepared the Performance Notice, which warned Watson to stay at her desk in the future and Terrell asked Watson to "clock out and go home." The Performance Notice was placed in Watson's file, but Home Depot took no further disciplinary action for this incident. Indeed, despite the fact that Watson had only worked for part of that day, Home Depot paid her for a full shift.

### 3. *Events After July 13, 2000*

Watson's relationship with Home Depot changed swiftly in the wake of the parking lot incident. Before leaving the store on July 13, she complained to Co-Store Manager, Al Stermer, about the confrontation and about being sent home for the day. Watson also contacted Home Depot's Midwest Region Human Resources Manager, James Owens ("Owens"), that day to complain that Terrell had belittled her and disciplined her unfairly.

According to a sworn statement that Watson submitted to Home Depot on July 24, 2000, and which Home Depot attaches as an exhibit to its 56.1 Statement, on July 14, Watson learned that her work schedule had been changed. Instead of working Monday to Friday from 8:00 a.m. to 5:00 p.m., she was now expected to work on the weekends with two weekdays off. As a single mother, Watson found this change burdensome and also complained about it to Owens.

On July 20, 2000, Owens called Jay Tippieconnic ("Tippieconnic"), the Store Manager, to tell him that Watson had complained about a write-up she received. The next day, after a week of confusion about Watson's new schedule, Tippieconnic met with Watson to discuss the entire situation. During their conversation, Watson broke down and explained that the situation went beyond the write-up. She described how on April 6, 2000, Terrell had followed her home during lunch, had asked to come into her apartment, and had then forced her into having sex with him. In Watson's statement, she alleges that she also described Terrell's poor treatment of her, but it is unclear what poor treatment she described. After hearing Watson's story, Tippieconnic sent Watson home, telling her he would pay her for the rest of that day and for the weekend and assuring Watson that he would have Michelle Williams ("Williams"), a Loss Prevention Specialist with whom Watson appeared to be comfortable, contact her over the weekend. Tippieconnic next called Owens and District Manager Ron Johnston to set up a meeting with Watson for the following Monday. Over the weekend, he spoke with Watson twice, reassuring her that Home Depot would not abandon her.

The following Monday, Owens, Williams, and Tippieconnic waited to meet with Watson. Watson arrived several hours late, and handed them the sworn statement in which she detailed her interactions with Terrell prior to, including, and after the alleged April 6 sexual encounter. Watson stated that Terrell had kissed her on January 27, 2000, while they were having lunch together, and that

he continued to flirt with her throughout February and March 2000. She also contended that during those months, Terrell failed to support her professionally, yelled at her at work, and was physical with her, at times grabbing her arm to move her from one spot to another. Watson stated that she complained to Terrell about his behavior and that he promised to improve. On April 6, however, Watson alleged that during her lunch hour, Terrell followed her home and, despite being told not to come into her apartment, entered Watson's home and raped her repeatedly. After the alleged rape, Watson stated that Terrell had become increasingly hostile toward her. Watson conceded that she was in a friend's car when Terrell and Neubert issued the Performance Notice. She claimed, however, that the friend was also her customer and had asked Watson to walk with her to explain Home Depot's credit and sales programs. She asserted that Terrell had punished her for the parking lot incident and changed her schedule in retaliation for Watson's refusal to engage in a sexual relationship with him.

After reading Watson's statement, Owens attempted to ask Watson questions about what she had written. Watson refused to provide additional information or to answer his questions and replied that everything she had to say was in the statement itself. Watson did express concern that she would be terminated and that Terrell would harm her, however, Owens assured Watson that Home Depot would immediately begin a complete investigation of her allegations and that she would not lose her job. He also asked Watson to think about whether she wished to continue to work at the

North Avenue store, or whether she would prefer to be transferred elsewhere. During the investigation, Home Depot placed Watson on paid administrative leave and suspended Terrell.

### 4. *The Investigation*

At the end of July, Watson contacted the Chicago Police Department to report the April 6 incident. Meanwhile, as promised, Owens began the investigation of Watson's claim. Together with EEO Specialist Doris Stephenson ("Stephenson") and Associate Relations Manager Chris Nichols ("Nichols"), Owens interviewed twenty-one people, including Terrell, Home Depot managers, supervisors, and employees, and non-Home Depot personnel whom Watson had identified as witnesses. None of the relevant witnesses corroborated Watson's allegations that Terrell had acted inappropriately toward her or had mistreated her. Owens, Stephenson, and Nichols interviewed Terrell twice, once on July 27 and again on August 9. Terrell denied all of Watson's allegations regarding inappropriate behavior. He denied ever having visited Watson's home and contended that he was at his apartment on April 6 at the time of the alleged assault. Although Watson had described Terrell as leaving her apartment at 5:15 p.m. on April 6, Terrell's landlady told Home Depot that she had spoken with Terrell between 4:30 p.m. and 5:00 p.m. that day. Watson's landlord also contested Watson's allegation that he had met Terrell when Terrell was entering Watson's apartment on April 6. The landlord showed Owens, Nichols, and Stephenson a copy of his own calender that indicated that he was not at Watson's apartment building that afternoon.

With regard to the parking lot incident, the investigation team spoke with Deborah Crawford, who confirmed that she was with Watson in the parking lot on July 13 when Watson was reprimanded. They also spoke with Neubert, who told the investigators that Watson had become angry, yelled and threw the Performance Notice at Terrell when Terrell reprimanded her.

Owens also investigated Watson's allegations that Terrell had changed her schedule to punish her for not engaging in a sexual relationship with him. Ivan Justiano, an associate in the North Avenue store, told the investigation team that he was in charge of writing Watson's schedule and that he had previously scheduled her to work weekends. Owens reviewed all of Watson's time and payroll records and found no support for Watson's claim that she worked a set weekday schedule and never worked weekends.

Finally, Tippieconnic told the investigators that prior to July 21, 2000, Watson had never complained about Terrell and stated that he had been unaware of any of the events described in Watson's statement. Throughout the investigation, Watson repeatedly refused to discuss her statement with Owens or with any other members of the investigation team.

### 5. After the Investigation

On August 18, 2000, Home Depot concluded its investigation and determined that Watson's allegations of sexual harassment could not be substantiated. Despite its findings, Home Depot offered Watson the option of transferring to a different store in the same position and at the same pay. Home Depot also transferred Terrell

to another store on July 31, 2000, so that Watson could remain at the North Avenue location if she wished. Instead of returning to Home Depot, however, Watson requested an unpaid medical leave of absence due to depression and temporary psychological distress, which Home Depot granted. Home Depot provided Watson with its medical leave policy, which explained that her employment would be terminated if she did not return to work after a one-year absence. After Watson failed to return to work upon expiration of her medical leave (not prior to the expiration as Home Depot contends), Home Depot sent Watson a letter explaining that she was terminated from active employment.

Just prior to taking medical leave, on August 15, 2000, Watson filed a charge with the Equal Employment Opportunity Commission (the "EEOC") alleging that she had been sexually harassed, raped, and suspended by Terrell and asserting a Title VII claim based on her sex. The EEOC issued a Right to Sue Notice on December 29, 2000 and on March 2, 2001, Watson timely filed her complaint in this Court. She filed her second amended complaint on October 10, 2001.

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact

is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. In such a situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial." *Id.* at 323.

## B. Counts I and II - Title VII Violation

Title VII forbids any workplace discrimination with respect to "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In her complaint, Watson alleges that Home Depot subjected her to tangible employment action (Count I) and hostile work environment harassment (Count II). In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), however, the Supreme Court abandoned the distinction between *quid pro quo* harassment and hostile environment harassment for vicarious liability purposes. *Ellerth*, 524 U.S. at 760-65; *Faragher*, 524 U.S. at 807. Instead, the Court created a distinction between "cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not." *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000). The Supreme Court explained that an employer was vicariously liable "to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" where "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765. In cases where the supervisor took no tangible employment action, however, the Supreme Court permitted the

defending employer to raise an affirmative defense to liability or damages. *Faragher*, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765.

In other words, as a result of *Faragher* and *Ellerth*, if Watson is able to demonstrate that Terrell created an actionable hostile environment *and* took tangible employment actions against her, she establishes that Home Depot is vicariously liable for Terrell's actions and the inquiry is at an end. If, on the other hand, Watson demonstrates that she endured an actionable hostile environment but fails to establish that Terrell took any tangible employment actions against her, Home Depot may raise the affirmative defense.

Home Depot focuses its argument on whether Terrell took any tangible employment actions against Watson and not on whether he created a hostile work environment. Indeed, if the evidence is viewed, as it must be, in the light most favorable to Watson, *Miller*, 203 F.3d at 1003, a reasonable jury could find that Terrell's alleged actions constituted sexual harassment or created a hostile environment. As a result, the Court will turn directly to the threshold issue of whether Watson suffered any tangible employment actions.

### 1. *Tangible Employment Action*

In *Ellerth*, the Supreme Court explained that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at

761.  In her complaint, Watson alleges that Terrell: 1) failed to give Watson adequate support in her job; 2) assigned Watson to excessive check out duties; 3) interfered with Watson's ability to perform her job by harassing her; 4) wrongfully accused her of violating store policies; 5) suspended her; 6) changed her work schedule; and 7) terminated her.

In its Memorandum in Support of Its Motion for Summary Judgment, Home Depot argues that all of these actions, if true, are either insufficiently adverse to be considered tangible job actions or are unsupported by the record.  Apart from this blanket statement, Home Depot does not specifically address Watson's allegation that Terrell wrongfully accused her of violating store policies.  But standing alone, a false accusation does not rise to the level of an adverse action. *Szymanski v. County of Cook*, No. 01 C 9588, 2002 WL 31509780, at *8 (N.D. Ill. May 8, 2002).  Home Depot does address the remaining alleged actions.  The Court need not walk through each allegation, however, because in her Memorandum in Support of Its Motion for Dismissal of Summary Judgment ("Response"), Watson fails to address any of Home Depot's arguments.  Indeed, she does not even mention several of the alleged employment actions and merely reiterates that her work schedule changed and that she was terminated.  Moreover, due to Watson's failure to respond to Home Depot's 56.1 Statement, she has admitted facts that are fatal to her claims, including the work schedule and termination claims.  She does not contest:  1) that check out duties were part of her responsibilities in the Pro Sales

Department; 2) that she was not suspended for the parking lot incident and that she was paid for the remainder of her shift that day; 3) that Owens' review of her time cards indicated that she had worked weekend days throughout her time at Home Depot; and 4) that Home Depot terminated Watson for failing to return from medical leave pursuant to company policy and that Terrell had been transferred to another Home Depot at the time Watson was terminated. Watson has failed to meet her burden of establishing that there is a genuine issue for trial as to whether Terrell took tangible employment action against her.

### 2. *Affirmative Defense*

Because Watson has failed to demonstrate that Terrell took a tangible employment action against her, Home Depot may raise the affirmative defense to liability or damages set forth in both *Faragher* and *Ellerth*. To defend itself successfully, Home Depot must establish: (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that Watson unreasonably failed to take advantage of any preventive or corrective opportunities provided by Home Depot or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765.

### a. **Home Depot's Exercise of Reasonable Care**

To avoid liability, Home Depot must first demonstrate that it exercised "reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. The existence of "an appropriate anti-harassment policy will often satisfy this first prong, because Title VII is

- 16 -

designed to encourage the creation of anti-harassment policies and effective grievance mechanisms." *Shaw v. Autozone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999)(internal citations and quotation marks omitted). In this case, it is undisputed that Home Depot had numerous written policies in place throughout Watson's employment prohibiting sexual harassment. These policies included a Harassment/Discrimination Policy, a Respect Policy, and an Equal Employment Opportunity Policy. While the Harassment/Discrimination Policy could have been more tailored to address sexual harassment specifically, it stated clearly that "Home Depot does not tolerate harassment or discrimination" based on sex and directed employees to complain about conduct they found offensive, harassing or disrespectful.

These policies also established multiple procedures for employees to follow in the event that they experienced any harassment, thereby permitting employees to bypass the harassing supervisor in the complaint process. These procedures included contacting various managers, human resources personnel, or using the Alert Line, a phone line that enabled employees to report harassment anonymously. Home Depot also maintained an Open Door Policy, which emphasized that supervisors' doors were "always open" and that if a Department Supervisor or Assistant Manager could not help an employee, the problem "should be taken" up the chain of command. The Open Door Policy also reminded employees that the Human Resource Manager "is always available to help you with concerns and issues." Watson acknowledges that she received copies

of these policies and underwent extensive training on the policies and procedures during her orientation.

Home Depot also acted swiftly and decisively to correct the harassment once it learned of Watson's allegations. After his initial meeting with Watson, Tippieconnic, the Store Manager, immediately gave her the weekend off with pay. He also set up a meeting the following Monday to discuss Watson's allegations. At that meeting, Owens assured Watson that Home Depot would investigate her allegations and offered Watson the choice of continuing to work at the North Avenue store, or of being transferred elsewhere with the same pay and position. Home Depot also immediately placed Watson on paid administrative leave and suspended Terrell. It then proceeded to do a thorough and extensive investigation of Watson's claims. Even though the investigation failed to substantiate Watson's allegations of sexual harassment, Home Depot transferred Terrell to another store so that Watson could remain at the North Avenue store if she wished. It also granted Watson's request for a one-year unpaid medical leave of absence.

In spite of these actions, Watson still contends that Home Depot did not take reasonable care to prevent and correct the harassment "until after the fact." The undisputed evidence establishes, however, that Home Depot had promulgated its policies and procedures regarding harassment before Watson began at Home Depot and before any alleged harassment occurred. Watson also appears to argue that Home Depot failed to correct the harassment

by reneging on alleged promises to relocate her to another apartment and to assist her in dealing with the rape. Yet she places this argument in a paragraph dealing with her negligent retention claim, which the Court has dismissed. Moreover, she fails to adduce any evidence to support her contention that Home Depot made these promises. There is certainly nothing in the company policies to suggest that such actions are part of Home Depot standard procedures as Watson appears to suggest.

Regardless, the facts establish that Home Depot took reasonable steps to prevent sexual harassment and that, when faced with allegations of harassment, also took extensive steps to correct the violation. As a matter of law, Home Depot has satisfied the first prong of the *Ellerth/Faragher* affirmative defense.

### b. Watson's Unreasonable Failure to Report Harassment

Home Depot must also establish that Watson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. According to Watson, the harassment began when Terrell kissed her on January 27, 2000. It continued through February and March 2000 when Terrell flirted with her, failed to give her professional support, yelled at her, and was physically aggressive with her. On April 6, Terrell allegedly raped her repeatedly. Despite her escalating problems with Terrell, Watson did not complain to anyone until she spoke to Owens on July 21, 2000. Home Depot argues that given

Watson's knowledge of the harassment policies and procedures, that her delay in complaining about Terrell's behavior was unreasonable.

In her Response, Watson argues that she failed to complain about the harassment because she feared Terrell. It is, of course, asking a great deal to require a victim of sexual harassment to come forward and reveal what they have endured to their employer. But as the Supreme Court explained, "a victim has a duty to use such means as are reasonable under the circumstances to avoid or minimize [] damages." *Faragher*, 524 U.S. at 806 (internal citations and quotation marks omitted). This duty exists even if the employee fears confrontation, unpleasantness or retaliation in return for speaking out. *Shaw,* 180 F.3d at 813. In this case, Home Depot had established a variety of reasonable mechanisms for employees to report harassment, including the anonymous tip line and open-door policy, that permitted employees to bypass the offending supervisor in reporting the harassment. Moreover, even if the alleged rape made Watson's fears of Terrell reasonable, she endured several months of harassment prior to the rape without alerting Home Depot. During this time, Watson complained directly to Terrell about his behavior and he promised to improve. When those promises proved hollow, Watson still chose not to use Home Depot's mechanisms for reporting the harassment.

"[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure

will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher,* 524 U.S. at 807-808. Watson's failure to use Home Depot's procedures to report *any* of the harassment she allegedly suffered, despite her knowledge of those procedures, was unreasonable. Home Depot has satisfied the second element of the affirmative defense and, as a result, the Court grants summary judgment on Counts I and II in its favor.

### CONCLUSION

For the reasons set forth above, Home Depot's Motion for Summary Judgment is **granted** as to Counts I and II. Watson's action is **dismissed in its entirety.**

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: *July 31, 2003*